**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

IN RE AFRODITI LEDSTROM.

PETER ELIADES, *et al.*,

               Appellants,

   v.

DOLORES ELIADES,

               Appellee.

Case No. 2:15-cv-01145-APG
(Consolidated with ECF No. 2:15-cv-01201-APG)

**OPINION**

Appellants Peter Eliades; Peter Eliades as Trustee of the Eliades Family Trust; Aristotle Holding, LP; Pete the Greek, LLC; and Aristotelis Eliades appeal the bankruptcy court's preliminary ruling on a variety of issues in a consolidated adversary action. ECF Nos. 1, 20, 23. Appellee Dolores Eliades opposes. ECF No. 41.  The receiver appointed by the bankruptcy court also filed an opposition brief. ECF No. 46.

# I. BACKGROUND

This case arises out of a dispute about who owns and controls a family-run business, the Olympic Garden Gentlemen's Club (also known as the "OG"), and who owes what to whom as a result of the family's financial transactions.  On one side are: (1) appellant Peter Eliades (the father of Dolores, Aristotelis, and Afroditi) and entities controlled by him; (2) appellant Aristotelis Eliades (also known as Telly); and (3) non-appellant and debtor Afroditi Eliades.  The bankruptcy court and the parties refer to this side of the dispute as the Eliades Family Group.  On the other side is appellee Dolores Eliades.

The consolidated adversary action involves interrelated lawsuits filed in state court that were removed to the bankruptcy court as part of Afroditi's bankruptcy proceeding.  The first lawsuit was filed in December 2009 by the Eliades Family Group against Dolores regarding

alleged breaches of loan agreements, breach of fiduciary duties, and fraud. ECF No. 1 at 51. Dolores counterclaimed that Peter, Telly, and Afroditi were conspiring against her to deprive her of her interest in the OG. *Id.* In 2011, Dolores filed her own complaint but the state court determined it was duplicative of her counterclaims in the first lawsuit so it was dismissed. *Id.* at 52. In November 2011, Aristotle Holding (an entity owned by Peter) filed an unlawful detainer action against the OG, alleging that the club was not paying rent and was holding over after being notified its lease was terminated. *Id.*

In 2012, Afroditi filed for bankruptcy after a multi-million-dollar judgment was entered against her in litigation related to a car accident in which a third party, Michael Ponzio, was killed. *Id.* at 53. Afroditi then removed the state court litigation to bankruptcy court where all the lawsuits were consolidated into one adversarial proceeding. *Id.*

The bankruptcy court made extensive factual findings and I will not repeat them in full here. In sum, the Eliades Family Group claims that Dolores owes substantial sums to Peter for purported loans he made to her so she could purchase her share in the two entities that now own the OG and for her share in another entity that purchased land adjacent to the OG. The Eliades Family Group also contends Dolores owes sums she stole from the club and from Peter personally while she operated the OG. Dolores, in contrast, contends that the Eliades Family Group has conspired to divest her of her interest in the OG in retaliation for her refusal to assist the family in shielding Afroditi's assets from the Ponzio wrongful death lawsuit.

The Eliades Family Group requested the bankruptcy court order the immediate dissolution of the two limited liability companies that owned the OG because the members were deadlocked and because Afroditi filed for bankruptcy. *Id.* at 53. The Eliades Family Group agreed a receiver could be appointed but only to wind up the club's affairs upon dissolution.[1] *Id.* Aristotle Holding requested the OG be evicted and for restitution of the premises based on non-payment of rent under a 2010 lease. *Id.* at 53-54. Peter moved for a pre-judgment writ of attachment on Dolores's

---

[1] The OG since has been sold.

ownership interest in the OG based on sums she allegedly owes under various loans and because she stole from him. *Id.* at 54.

Dolores opposed dissolution because it would destroy her interest in the OG. *Id.*  She also asserted that the effort to evict the club was part of the Eliades Family Group's efforts to deprive her of any value from the club. *Id.*  In response to Peter's motion for a writ of attachment, Dolores argued the purported loans were actually gifts, Peter waived the right to payment by failing to demand payment for years, and her withdrawals were authorized by Peter or his late wife, Janet. She also argued that to the extent Peter was entitled to any recovery, she was entitled to an offset for certain gaming space lease payments that Peter received instead of those payments going to the OG. *Id.*

The bankruptcy court appointed a temporary receiver and the proceedings were stayed for some time while the parties negotiated a sale of the club and settlement. *Id.* at 56-57.  At the parties' request for a temporary solution to operate the club in the meantime, the bankruptcy court ordered Telly, Afroditi, and Dolores to hold weekly meetings on the club's operation, with the bankruptcy trustee also attending as a tie breaker when needed. *Id.* at 58.  The Ponzio wrongful death claim thereafter settled and Afroditi's bankruptcy plan was confirmed. *Id.*

When no further settlements could be consummated, the parties requested the bankruptcy court resolve their various motions. *Id.*  The bankruptcy court made preliminary rulings and the Eliades Family Group appeals on numerous grounds.  I address each in turn below.

**II. STANDARD OF REVIEW**

I review de novo the bankruptcy court's conclusions of law. *In re Rains*, 428 F.3d 893, 900 (9th Cir. 2005).  I review its factual findings for clear error. *Id.*  The bankruptcy court's factual findings are clearly erroneous only if they "leave the definite and firm conviction" that the bankruptcy court made a mistake. *Id.* (quotation omitted).  Under clear error review, if the bankruptcy court's findings are "plausible in light of the record viewed in its entirety," I may not reverse them even if I would have "weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).  In other words, "[w]here there are two

permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," particularly where the decision rests on a credibility determination. *Id.* at 574-75.  But if documents or objective evidence so contradict a witness's testimony, or testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it," then I may find clear error even if the bankruptcy court's findings are based on a credibility determination. *Id.* at 575.  I may affirm the bankruptcy court's decision "on any ground fairly supported by the record." *In re Warren*, 568 F.3d 1113, 1116 (9th Cir. 2009).

## III.  ANALYSIS

### A.  Pre-Judgment Writ of Attachment

Peter contends the bankruptcy court erred by not granting him a pre-judgment writ of attachment on Dolores's interests in the two entities that owned the OG: OG Eliades, LLC (OGE) and OG Eliades A.D., LLC (OGEAD).  Peter argues that Dolores's interests in these two entities are her only assets, he demonstrated probable validity of his claims that Dolores owes him money, and the bankruptcy court therefore should have issued the writ.  Specifically, Peter contends he showed Dolores owed him money for: (1) a $763,099.55 balance on a loan Peter made to Dolores so she could purchase her share of ownership interests in SHAC Eliades, LLC, an entity formed to purchase the Sapphire Club; (2) a $3,334,934.24 balance on a loan Peter made to Dolores so she could purchase her share in OGE; (3) a $3,185,273.97 balance on a loan Peter made to Dolores so she could purchase her share in OGEAD; (4) over $1 million Dolores took from one of Peter's accounts to buy her daughter a house and to pay for meals, gifts, clothing, and other personal expenses; and (5) a $2,444,541.86 balance on a loan Peter made to Dolores so she could purchase her share in AA and D of Nevada, LLC (AAD), a company formed to hold property located next to the OG.[2]

---

[2] Peter argues in his reply brief that Dolores should be equitably estopped from arguing she does not owe the claimed amounts. ECF No. 51 at 48-49.  He also argues the parol evidence rule would bar Dolores from contradicting the written documents. *Id.* at 52-53.  I decline to consider these arguments, raised for the first time in a reply brief. *See Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988).

Dolores responds that the amounts Peter claims for AAD and Dolores's daughter's house are each secured by a lis pendens on two different properties so a writ is unnecessary. Dolores also argues that a writ of attachment is unnecessary because any other money taken from the club is small in comparison to the amount of her interest in the club. She asserts Peter has waived any right to repayment on the balance of the loan related to SHAC and that the balance was satisfied when the children paid off another loan on Peter's behalf. Finally, as to the promissory notes related to her share in OGE and OGEAD, Dolores argues the bankruptcy court's conclusion that Peter was unlikely to prevail on these claims is supported by the evidence.

The bankruptcy court found that the documents underlying the family's transactions were "riddled with inconsistent signing dates and date modifications," that the documents "were only created to appease regulators and maintain the appearance of business formalities without ever being given actual effect," and the "documentary backdrop was largely ignored so long as the family remained unfractured." ECF No. 1 at 21-22. Consequently, the bankruptcy court concluded that "enforcing the letter of the documents in this record is virtually impossible." *Id.* at 22.

In line with this conclusion, the bankruptcy court found Peter never required payment from his children on the OGE and OGEAD promissory notes until after this litigation commenced. *Id.* at 43-44 ("The Court finds no credible evidence he truly expected payments from his children for the OG Club until things went wrong."). The bankruptcy court made this same finding with respect to AAD.[3] *Id.* at 44. The bankruptcy court thus found Peter had not satisfied his burden of showing his claims had probable validity to support a mandatory writ of attachment.

---

[3] Peter claims on appeal that the bankruptcy court should have issued a writ of attachment against Dolores's interests in OGE and OGEAD because she personally owes him for a loan to pay for her interest in AAD. However, Peter's attorneys stated below that the entity, not Dolores personally, owes Peter. *See* ECF No. 22-37 at 426-27; *see also id.* at 422 (Afroditi testifying that AAD, and not the three children, owes Peter). As to the alleged remaining balance on the SHAC loan, it is unclear whether the bankruptcy court found Peter did not expect repayment, but I understand the bankruptcy court to have generally found that Peter required payment from his children only when necessary to document transactions to non-family third parties or when disputes with family members arose. Peter may seek clarification on this issue on remand.

1   *Id.* at 88.  Specifically, the court noted there were significant disputes about whether the

2   promissory notes were enforceable and whether Peter waived a right to payment. *Id.*

3          As to the theft allegations, the bankruptcy court acknowledged that it viewed with

4   skepticism Dolores's testimony about her authority to make all of the challenged expenditures,

5   but that issues surrounding Dolores's express or implied authority to act in relation to the

6   accounts raised doubts about Peter's ability to show Dolores had the requisite intent to steal. *Id.* at

7   88-89.  The court thus denied a mandatory writ of attachment. *Id.* at 89.  The bankruptcy court

8   also denied a discretionary writ as unnecessary because Dolores's interest in the OG was not in

9   danger of being moved outside the court's jurisdiction and the court was appointing a receiver to

10  protect the club's value. *Id.*

11         Under Nevada law, a plaintiff may apply for a writ of attachment on the defendant's

12  property as security for the satisfaction of a judgment that may be recovered in a lawsuit. Nev.

13  Rev. Stat. § 31.010(1).  The court has discretion to issue a writ of attachment with or without

14  notice in certain cases. *Id.* §§ 31.013, 31.017.  For example, the court may order a writ of

15  attachment without notice if the court determines that the defendant converted the plaintiff's

16  property without consent or money was obtained through embezzlement. *Id.* §§ 31.017(3), (6),

17  31.022.  If the court orders the defendant to show cause why an attachment order should not

18  issue, it must hold a hearing and determine the "probable validity of the plaintiff's underlying

19  claim against the defendant." *Id.* §§ 31.024, 31.026.  "If the court determines such claim is

20  probably valid it shall order the clerk to issue a writ of attachment." *Id.* § 31.026.

21         The bankruptcy judge held a multi-day evidentiary hearing during which he heard

22  testimony from Peter, Afroditi, Telly, Dolores, and other witnesses.  He thus had the opportunity

23  to evaluate the parties' credibility and examine the evidence underlying Peter's claims.  The

24  bankruptcy judge's finding that factual disputes remain such that Peter's claims lack probable

25  validity is not clearly erroneous.  There is an evidentiary basis for the bankruptcy judge's view

26  that questions remain about whether (1) the parties properly executed the promissory notes, (2)

27  those notes were executed for a lawful purpose, (3) Peter expected payment under those notes

28

before this litigation, (4) Peter waived payment rights, and (5) whether Dolores exceeded her authority and had intent to steal with respect to expenditures from Peter's account.  The record amply supports the bankruptcy judge's view that Peter was extremely generous with his children and required no payment from them so long as they remained on his good side, that the family's transactions were often not documented at the time of the transaction, and that the documented transactions and relationships often did not reflect how things functioned in practice.[4]  Peter's disagreement with the bankruptcy judge's evaluation of the evidence and the witnesses' credibility does not suffice to establish that the preliminary findings were clearly erroneous. Consequently, the bankruptcy court's refusal to issue a mandatory writ was not reversible error.

The bankruptcy court's refusal to issue a discretionary writ also was not error.  The asset that Peter seeks to attach is not in jeopardy of being dissipated or removed from the court's jurisdiction.  Accordingly, I affirm the bankruptcy court's decision to deny a writ of attachment.

### B.  The Lease

The parties disputed before the bankruptcy court which version of a lease governed the relationship between the OG and its landlord, Aristotle Holding.  The Eliades Family Group contends the bankruptcy court's finding that the 2007 lease is the governing document was clearly erroneous.  They argue the bankruptcy court was inconsistent when it found the 2010

---

[4] *See, e.g.*, ECF Nos. 22-4 at 192-93 (Dolores testified that Peter gifted interests in various companies to his children and "nobody's ever paid for anything"); 22-15 at 226-27, 231, 22-16 at 6, and 22-37 at 146 (Afroditi and Telly never made payments on loans and even though Peter allegedly demanded in 2009 that they either pay or surrender their interests in OGE and OGEAD; as of late 2012 neither had made payment or surrendered their interests); 22-37 at 131-32 (Peter and Janet had a history of giving large gifts to family members); *id.* at 141-42 (Peter put between $1 and $3 million in an account for Telly to buy stocks without asking for a promissory note); *id.* at 144 (Peter testified that he usually does not ask his children for promissory notes); *id.* at 187-90 (certain transactions are post-documented and transactions amongst family members were structured in ways that did not necessarily correspond to how things functioned in reality); *id.* at 390 (Afroditi testified that she never made payments to Peter except in relation to the Sapphire; she stated that transaction was handled differently because there was "a different [non-family] partner or a different group that was in there.  It was just a bit different . . . ."); 22-39 at 44 (testimony that documents memorializing agreements were not always prepared and executed at the time of the alleged agreements).  These citations are by no means exhaustive of the evidentiary record.  The appendices include extensive testimony and exhibits from evidentiary hearings before the state and bankruptcy courts.  The bankruptcy judge's factual and credibility findings are plausible in light of the entire record.

1  lease was invalid because it was signed by only one member of OGE and OGEAD (Telly), yet it

2  found the 2007 lease was valid even though it likewise was signed by only one member of OGE

3  and OGEAD (Dolores).  The Eliades Family Group also asserts that in making this finding, the

4  bankruptcy court erred by rejecting their handwriting expert's conclusion that Peter did not sign

5  the 2007 lease and by finding a novation occurred.[5]

6      Dolores and the receiver respond that the bankruptcy court's decision is supported by the

7  evidence because witnesses testified that Telly and Afroditi allowed Dolores to handle everything

8  at the OG until the disputes arose, whereas Dolores did not agree to allow Telly to handle matters

9  after she was ousted from the club.  The receiver argues the bankruptcy court explained why it

10  rejected the handwriting expert's conclusions and, in any event, the bankruptcy court found that

11  the signature on the 2007 lease was by Peter's authorized representative.

12      Peter owned the OG in 2006 when he transferred 50% of his interest to OGE, a limited

13  liability company owned in equal shares by Dolores, Telly, and Afroditi. ECF No. 1 at 19.  At

14  that point, the club was owned and operated by a partnership between Peter and OGE as equal

15  partners. *Id.*  In 2007, close in time to Afroditi's car accident in which Ponzio was killed, Peter

16  transferred his remaining 50% interest in the OG to OGEAD, a limited liability company owned

17  in equal shares by Dolores and Telly. *Id.* at 20.  From then on, the club was owned and operated

18  by a partnership between OGE and OGEAD as equal partners. *Id.*  Both of these transactions

19  were putatively structured as the children purchasing Peter's ownership interests in the OG, with

20  Peter privately financing the purchases. *Id.* at 20-23.  However, the parties did not execute formal

21  written purchase agreements or promissory notes at the time of transfer and none of the children

22  made payments to Peter before this litigation. *Id.* at 21.

23      Under both entities' operating agreements, decisions affecting the limited liability

24  companies must be unanimous among their members. *Id.* at 22-23.  But the bankruptcy court

25  found that the three children "have largely ignored the requirements in the operating agreement in

26

27  [5] In their reply briefs, the Eliades Family Group argues the bankruptcy court erred by raising the novation issue *sua sponte*. ECF Nos. 50 at 8; 51 at 64-5.  I decline to consider this argument, raised for the first time in a reply brief. *See Northwest Acceptance Corp.*, 841 F.2d at 924.

28

1   practice." *Id.* at 22; *see also id.* at 23.  Instead, Dolores operated the club with Telly and

2   Afroditi's knowledge and agreement until Dolores was ousted from the club. *Id.* at 30, 35.

3       The OG does not own the land on which it operates. *Id.* at 25.  That property is owned by

4   Aristotle Holding, which in turn is owned by Peter. *Id.*  In 2006, the OG (through Peter and OGE)

5   entered into a lease with Aristotle Holding. *Id.* at 28.  The bankruptcy court found that Peter's

6   wife, Janet, signed the lease for Aristotle Holding and signed for Peter (for his share of the OG)

7   with his express authority to do so. *Id.*  Dolores signed the lease on behalf of OGE. *Id.*  This lease

8   was for an initial two-year term at $50,000 per month, followed by two five-year automatically

9   renewed terms unless Aristotle Holding gave written notification declining renewal. *Id.*

10      The bankruptcy court found that the OG and Aristotle Holding entered into another lease

11  in 2007 after Peter transferred his remaining 50% interest in the club to OGEAD. *Id.* at 28-29.

12  Dolores signed the 2007 lease on behalf of OGE and OGEAD. *Id.* at 29.  Peter or someone

13  authorized to sign on his behalf signed the 2007 lease on behalf of Aristotle Holding, and it was

14  also signed by a third party witness. *Id.*  The 2007 lease was for a term of 99 years at a monthly

15  rental rate of $25,000 per month. *Id.*

16      In late 2008 or early 2009, Afroditi discovered irregularities in Dolores's use of Peter's

17  and the club's accounts. *Id.* at 31.  Afroditi informed her father, they confronted Dolores, and

18  Dolores left the OG. *Id.*  According to Dolores, the dispute arose between her and the rest of the

19  family when she refused to capitulate to Peter's demands that she help Afroditi protect assets

20  from the Ponzios and refused to place Manny Varigiannis as manager at the OG. *Id.* at 33.  She

21  contends the Eliades Family Group since has conspired against her to deprive her of her rights in

22  the club because she did not bow to her father's wishes. *Id.* at 34-35.

23      In 2010, after this litigation was initiated, the OG entered into another lease with Aristotle

24  Holding, which was signed by Telly on behalf of OGE and OGEAD without Dolores's

25  knowledge or consent. *Id.* at 29-30.  The 2010 lease was month-to-month for $40,000 per month,

26  which either side could refuse to renew. *Id.* at 30.  The OG made no payments under the 2010

27

28

1    lease and shortly thereafter, Peter, through Aristotle Holding, commenced eviction proceedings.

2    *Id.*

3              The bankruptcy court ruled the 2007 lease controls. *Id.* at 42.  The bankruptcy court

4    credited Dolores's testimony that the club almost never paid rent because Peter did not require it

5    unless he needed it to appear that he was receiving rent for some other purpose. *Id.*  The

6    bankruptcy court found the 2007 lease bore indicia of validity because it was filed with local

7    licensing and law enforcement authorities before the disputes in this case arose. *Id.* at 29.  It also

8    was consistent with concerns that may have arisen related to licensing issues following the

9    transfer from Peter to OGEAD. *Id.*

10             In reaching this conclusion, the bankruptcy court rejected the Eliades Family Group's

11   handwriting expert, who opined that the signature on the 2007 lease was not Peter's. *Id.* at 40.

12   The bankruptcy court gave several reasons for rejecting this testimony, including that the expert

13   did not independently select exemplars of Peter's signature and the exemplars provided were

14   photocopies instead of originals. *Id.* at 41, 79.  Moreover, the bankruptcy court credited evidence

15   that Peter used family agents, including his late wife and Dolores, to sign for him. *Id.*  The

16   bankruptcy court noted that the signature on the 2007 lease resembled the signature on the 2006

17   lease, which Peter admitted was an authorized signature. *Id.*  The bankruptcy court thus

18   concluded the signature on the 2007 lease was "either his personally or that of an authorized

19   agent." *Id.*  In light of the conclusion that the 2007 lease was valid, the bankruptcy court also

20   determined the 2007 lease was a novation of the 2006 lease. *Id.* at 77-78.

21             In contrast, the bankruptcy court found the 2010 lease was invalid because OGE and

22   OGEAD lacked authority to enter into new leases without Dolores's consent. *Id.*  According to

23   the bankruptcy court, the 2010 lease was prepared to set up the eviction proceeding even though

24   Peter knew the lease could not be effective without Dolores's consent. *Id.* at 45, 80.  The

25   bankruptcy court specifically distinguished the situation where Dolores previously signed on

26   behalf of the other members of the limited liability companies: "Unlike in 2007, when all parties

27

28

1   admit Dolores had authority to act for them, [Peter and Telly] knew they did not have Dolores's

2   consent in 2010." *Id.* at 80-81.

3         There is no inconsistency between the finding that Dolores could sign on behalf of OGE

4   and OGEAD for the 2007 lease but Telly could not do so for the 2010 lease.  The bankruptcy

5   court's finding that Telly and Afroditi consented to Dolores running the club was supported by

6   the record. *See* ECF No. 22-8 at 56, 64 (Dolores was sole manager); 22-37 at 238-39 (Telly

7   testified he took it for granted that Dolores would run the club and he took little interest in it); 22-

8   41 at 99-100 (Afroditi was seldom at the club in 2006 and 2007).  The Eliades Family Group

9   admits the 2006 lease is valid even though it too is signed only by Dolores on behalf of OGE. *See*

10  ECF Nos. 22-8 at 115 (Dolores signed the 2006 lease as managing member of OGE; no signature

11  of Telly or Afroditi); 20 at 18 (parties agree 2006 lease was valid); 23 at 29 (same); 41 at 15, 27

12  (same).  That further supports the bankruptcy court's factual finding that Telly and Afroditi

13  agreed to grant Dolores authority to sign a lease on behalf of OGE and OGEAD.  Dolores did not

14  consent to Telly signing lease agreements on her behalf after she was ousted from the club. ECF

15  Nos. 22-41 at 144-45 (Dolores testifying she did not consent to the 2010 lease and would not

16  have done so because a month-to-month lease would jeopardize the club's privileged licenses);

17  22-40 at 98 (testimony that the City of Las Vegas would not have approved a liquor license for

18  someone with a month-to-month lease).  The other indicia of reliability the bankruptcy court

19  assigned to the 2007 lease are supported by the record. *See* ECF No. 22-8 at 105 (a liquor license

20  applicant must submit existing leases and update that information, and the 2007 lease was found

21  in the City of Las Vegas's files); *id.* at 110-12 (2007 lease with the signature of a third party

22  witness); *id.* at 114-15 (2006 lease); *id.* at 117 (2010 lease).

23        The bankruptcy court gave sufficient reasons for why it rejected the Eliades Family

24  Group's handwriting expert and those reasons are supported by the record. *See* ECF Nos. 22-15 at

25  249 (expert reviewed copies provided by email, not originals); 22-41 at 29, 34-35 (expert

26  reviewed copies, received exemplars from the attorneys, and did not obtain an exemplar from

27  Peter).  Moreover, the bankruptcy court indicated that the signature on the 2007 lease was either

28

1    Peter's or an authorized representative's.  Consequently, the handwriting expert's conclusion that

2    the signature on the 2007 lease was not Peter's is not dispositive on the issue.

3          Finally, the Eliades Family Group's arguments about the novation issue are a repackaging

4    of their argument that Telly and Afroditi did not consent to Dolores signing the 2007 lease on

5    behalf of OGE and OGEAD.  Because the bankruptcy court's finding that Dolores had such

6    authority is not clearly erroneous, the bankruptcy court did not err in finding a novation.  I

7    therefore affirm the bankruptcy court's preliminary ruling that the 2007 lease controls.

8          **C.  Waiver of Past-Due Rents**

9          Peter and Aristotle Holding argue the bankruptcy court erred by holding they waived their

10   right to pursue past-due rent payments under the 2006 or 2007 lease.[6]  They argue that in reaching

11   this conclusion, the bankruptcy court disregarded Peter's testimony that he had difficulty reading,

12   that he relied on his accountants to prepare his tax returns, and that he trusted Dolores to make the

13   required rental payments.  They thus argue Peter, and through him Aristotle Holding, did not

14   voluntarily relinquish a known right to past-due rent.  Alternatively, they argue that whether there

15   has been a waiver is a question for the trier of fact at trial.

16         Dolores responds that there was no finding that Peter is not entitled to past-due rent and,

17   in any event, Peter paid himself $40,000 per month in rent while the club was still operating.  The

18   receiver responds that the bankruptcy court's finding is not clearly erroneous because there was

19   evidence that Peter was aware he was not receiving rent and his later attempts to collect rent were

20   manufactured as a litigation position.

21         The bankruptcy judge found that Peter "never intended for the children to pay rent until

22   after things fell apart." ECF No. 1 at 43.  He also found that Aristotle Holding never served a

23   default notice, complained about not receiving rent, or sought an eviction from 2006 to 2010. *Id.*

24

25         _____

26         [6] In their reply brief, Peter and his related entities argue the bankruptcy court erred by raising *sua sponte* the issue of whether he or Aristotle Holding waived rent payments. ECF Nos. 50 at 8; 51 at 64-65. I decline to consider this argument, raised for the first time in a reply brief. *See Northwest Acceptance*

27   *Corp.*, 841 F.2d at 924.

28

1  The bankruptcy court credited Dolores's testimony that Peter required rent only when it was

2  necessary to document transactions related to third parties, and that Peter knew he was not paid

3  full rent as shown by his tax documents. *Id.*

4        These findings are plausible in light of the entire record.  As with the other issues raised

5  on appeal, the Eliades Family Group disagrees with the bankruptcy court's view of the evidence

6  and Peter's credibility but has not shown those findings were clearly erroneous.

7        The Eliades Family Group argues in the alternative that the question of waiver should be

8  decided at trial.  The bankruptcy court made the challenged factual findings in support of its

9  preliminary rulings on which lease controls and whether Aristotle Holding had a basis to evict the

10  OG. ECF No. 1 at 81-84.  The parties may seek clarification on remand whether a conclusive

11  ruling on the question of waived rents is reserved for the trier of fact on a full trial on the merits.

12  I therefore affirm the bankruptcy court's factual findings about waiver of rents insofar as those

13  findings support the preliminary rulings that the 2010 lease is invalid and the nonpayment of rent

14  does not support eviction or restitution of the premises under the 2006 or 2007 leases.

15  **D.  Writ of Restitution**

16        Aristotle Holding argues the bankruptcy court erred by not granting a writ of restitution

17  because it was undisputed the OG was not paying rent.  Dolores responds that because Peter took

18  rent payments of $40,000, there is no basis for Aristotle Holding to seek a writ of restitution.

19        The bankruptcy court denied the writ of restitution because the 2010 lease under which

20  Aristotle Holding sought to evict the OG was invalid, Peter accepted substitute performance in

21  the form of other lease payments, and Aristotle Holding and Peter waived rent payments because

22  they knew they were not being paid rent but made no attempt to collect. ECF No. 1 at 80-84.  The

23  bankruptcy court also found that the unlawful detainer argument was meritless because it was

24  based on the 2010 lease's month-to-month term but that lease is invalid. *Id.* at 84.  Likewise,

25  because the notice to quit was based on the 2010 lease and did not demand payment of rent or

26  surrender of the premises, it also did not support a claim for unlawful detainer. *Id.* at 84-85.

27

28

Because I affirm the bankruptcy court's finding that the 2010 lease is invalid, I also affirm its finding that Aristotle Holding is not entitled to evict the OG based on the 2010 lease's month-to-month provisions.  The 2007 lease's 99-year term has not expired, so the OG is not guilty of unlawful detainer based on holding over the property after the lease term expired. *See* Nev. Rev. Stat. § 40.250 (providing that a tenant is "guilty of an unlawful detainer when the tenant continues in possession . . . of the property . . . after the expiration of the term for which it is let to the tenant").

Further, the bankruptcy court's finding that Aristotle Holding failed to give notice it was basing its unlawful detainer and eviction on a failure to pay rent under any lease is supported by the record.  The notice to quit is based on the month-to-month provisions of the 2010 lease and says nothing about a demand to pay rent or surrender the premises. ECF No. 22-8 at 102; Nev. Rev. Stat. § 40.2512 (providing that a tenant is "guilty of an unlawful detainer when the tenant continues in possession . . . after default in the payment of any rent and after a notice in writing, requiring in the alternative the payment of the rent or the surrender of the detained premises, remains uncomplied with for a period of 5 days . . .").  Accordingly, I affirm the bankruptcy court's denial of Aristotle Holding's motion for a writ of restitution of the premises.

### E. Gaming Space Revenue

Peter argues the bankruptcy court erred by finding he had "no documentary right" to rental revenue from a lease with a third party gaming company.  Alternatively, he argues that even if there was no documented right, the three children, who are the managing members of the two entities owning the OG, all agreed that Peter would receive the revenue.  Peter thus argues that if the preliminary ruling means that he is not entitled to those rent payments, it is clearly erroneous.

Dolores responds that the bankruptcy court specifically said this issue still needed to be resolved, so there is nothing for this court to review on appeal.  The receiver responds that Peter assigned these rents to the OG in 2006 and that assignment was reaffirmed in the 2007 lease.  The

1    receiver contends the bankruptcy court's findings in relation to the assignment and the 2007 lease

2    thus are supported by the record.

3          While Peter was the sole owner of the OG, he also owned gaming machines located in the

4    club. ECF No. 1 at 25.  Due to issues with the gaming control board, Peter entered into an

5    agreement with a slot route operator, Golden Gaming, under which Peter sold the machines to

6    Golden Gaming, which then leased space at the OG for gaming purposes. *Id.* at 25-26.  Peter and

7    Golden Gaming executed a lease memorializing this agreement (the "gaming space lease"). *Id.* at

8    26-27.  In April 2006, Peter assigned the gaming space lease to the partnership between himself

9    and OGE that operated the OG. *Id.* at 28.  In June 2008, the OG and Golden Gaming modified the

10   gaming space lease and Dolores signed on behalf of both OGE and OGEAD. *Id.* at 27.  Neither

11   the assignment nor the 2008 modified gaming space lease provide that rental payments would go

12   to Peter. *Id.*  The 2007 lease between the OG and Aristotle Holding also does not mention that

13   gaming space lease payments would go to Peter. *Id.* at 29.  Nevertheless, in practice Peter was

14   paid the gaming space rents from Golden Gaming.  The bankruptcy court thus found Peter and

15   Aristotle Holding received $40,000 a month from the gaming space lease even though "Peter had

16   no documented right to these revenues" after the right to those payments had been assigned to the

17   OG and Peter had transferred away his interests in the OG. *Id.* at 45.

18         The bankruptcy court declined to consider in its preliminary ruling whether the OG is

19   entitled to enforce the assignment of the gaming space lease and demand that money back if Peter

20   is going to demand past-due rent from the club. *Id.* at 45-46.  Consequently, the issue of whether

21   Peter is entitled to keep the gaming space lease payments has not been resolved by the bankruptcy

22   court.

23         The bankruptcy court's factual findings in support of its preliminary rulings are supported

24   by the record.  Peter assigned the rights to the gaming space lease to the "partnership of Peter

25   Eliades and O.G. Eliades, LLC dba Olympic Garden." ECF No. 22-8 at 134 (assignment); *see*

26   *also id.* at 124-32 (original sublease).  Peter later assigned his interest in this partnership to

27   OGEAD.  Thus, the record supports a finding that Peter had no documented right to the gaming

28

space lease payments.  The testimony shows Peter nevertheless received the rents regardless of to whom Golden Gaming wrote the checks and regardless of the assignment of the right to those payments to the partnership operating the OG. *See* ECF Nos. 22-8 at 143 (Peter's affidavit stating he was entitled to the gaming space lease payments even after the children obtained a 50% interest in the club); 22-15 at 4-6 (Golden Gaming payments went to Peter regardless of who checks were made out to).  I therefore affirm the bankruptcy court's factual findings in its preliminary ruling that Peter had no documented right to the gaming space lease payments but nevertheless received them.

### F.  Aristotle Holding as Priority Creditor

Aristotle Holding argues the bankruptcy court erred by not declaring it a priority creditor based on unpaid rents.  Dolores does not specifically respond to this argument, but groups it with other issues she claims either were not raised below or were not resolved by the bankruptcy court. In reply, Aristotle Holding agrees this issue should be resolved by the bankruptcy court. ECF No. 51 at 77-78.  I therefore do not address it.

### G.  Appointment of a Receiver

The Eliades Family Group argues the bankruptcy court erred in appointing a receiver because the Bankruptcy Code precludes it and because there was no basis to do so where the club was being run by the owners and the bankruptcy trustee.  Dolores argues this is moot because the club was sold.  The receiver responds that it was not appointed under the Bankruptcy Code; rather it was appointed in an adversary action based on state law.  The receiver also argues that the Eliades Family Group objects to the receiver's performance post-appointment, which cannot support a finding that the bankruptcy court erred in appointing the receiver in the first place. Finally, the receiver contends its post-appointment performance does not support reversal because it was appointed to sell the club, not to operate it, and it achieved that sale in July 2015.

The Eliades Family Group does not respond to Dolores's contention that this issue is moot on appeal.  The OG was sold in July 2015. ECF Nos. 41 at 13; 51 at 78.  Thus, any challenge to the bankruptcy court's appointment of a receiver to operate the club during the sale and

1    dissolution process is now moot because the club has been sold. *See Focus Media, Inc. v. Nat'l*

2    *Broad. Co., Inc.*, 378 F.3d 916, 922-23 (9th Cir. 2004); *Baker & Drake, Inc. v. Pub. Serv.*

3    *Comm'n*, 35 F.3d 1348, 1351 (9th Cir. 1994).

4         To the extent any issues remain about whether the receiver was properly appointed, I

5    affirm the bankruptcy court's decision.  The bankruptcy court noted that while Dolores ran the

6    business, it was quite profitable but that following her departure, revenues plummeted. ECF No. 1

7    at 46-47.  He also noted that the sudden change in fortune raised questions about whether cash

8    receipts were being properly accounted for, particularly because the OG is primarily a cash

9    business. *Id.* at 47.  The bankruptcy court also found a particular practice of the OG following

10   Dolores's departure suggested not all money was being accounted for and the Eliades Family

11   Group had not explained that discrepancy. *Id.* at 48.  Nor had the Eliades Family Group given

12   consistent testimony on how the club was performing financially. *Id.*

13        This led the bankruptcy court to adopt an interim measure while the parties attempted

14   settlement. *Id.*  The bankruptcy court ordered the three children to have weekly meetings about

15   the club's business that also would be attended by the bankruptcy trustee to break deadlocks if

16   necessary. *Id.* at 48-49.  That procedure worked for a period of time but it no longer was working

17   because the management group was in "deadlock, if not total disarray." *Id.* at 49.  The Eliades

18   Family Group agreed "that the current ownership cannot work together and are deadlocked on

19   key issues." *Id.* at 59.  They disagreed only what should be done about it, immediate dissolution

20   or appointment of a receiver. *Id.* at 59-60.

21                    1.  Authority to Appoint a Receiver

22        The Eliades Family Group argues that 11 U.S.C. § 105(b) prohibits a bankruptcy court

23   from appointing a receiver.  The bankruptcy court acknowledged this but interpreted this

24   provision to mean that although it may not appoint a receiver in lieu of a bankruptcy trustee, it is

25   not precluded from appointing a receiver in all circumstances. ECF No. 1 at 60.  The bankruptcy

26   court concluded it had authority under Nevada law to appoint a receiver in the consolidated

27   adversary action, which involved state law disputes. *Id.* at 71-72.

28

1        Section 105(b) states that a bankruptcy court "may not appoint a receiver in a case under

2    this title."  Courts have interpreted this provision to mean that a bankruptcy court cannot "appoint

3    a receiver for the estate in lieu of a trustee." *In re Cassidy Land & Cattle Co., Inc.*, 836 F.2d

4    1130, 1133 (8th Cir. 1988) (citing *In re Memorial Estates, Inc.*, 797 F.2d 516, 520 (7th Cir.

5    1986)).  However, bankruptcy courts have the power to appoint receivers in adversary

6    proceedings under applicable state law. *Id.*

7        That is what the bankruptcy court did here.  It acknowledged it could not appoint a

8    receiver in lieu of a trustee for Afroditi's bankruptcy estate.  Rather, the bankruptcy court

9    appointed a receiver over the partnership running the OG pursuant to Nevada law in the

10   consolidated adversary proceeding involving state law claims.[7]  I affirm the bankruptcy court's

11   conclusion that it had the authority to appoint a receiver.

12   ## 2.  Decision to Appoint a Receiver

13       The Eliades Family Group argues that even if the bankruptcy court had the authority to

14   appoint a receiver, it should not have done so because the club was functioning well under the

15   family's control but lost money once the receiver took over.  The bankruptcy court appointed a

16   receiver to "promote[] justice" because the parties were "hopelessly deadlocked" and could not

17   make decisions for the partnership running the OG. ECF No. 1 at 72-73.  The bankruptcy court

18   thus appointed the receiver to "move the Club toward expeditious dissolution or sale." *Id.* at 73.

19       Under Nevada law, a court may appoint a receiver in an action between partners jointly

20   owning a property or fund "where it is shown that the property or fund is in danger of being lost,

21   removed or materially injured." Nev. Rev. Stat. § 32.010(1).  A court also may appoint a receiver

22   in "all other cases where receivers have heretofore been appointed by the usages of the courts of

23   equity." *Id.* § 32.010(6).  Appointment of a receiver is "a harsh and extreme remedy which should

24   be used sparingly and only when the securing of ultimate justice requires it." *Hines v. Plante*, 661

25

26

27       [7] In their briefs before the bankruptcy court, the Eliades Family Group agreed a receiver could be
     appointed under Nevada law. ECF Nos. 22-22 at 4; 22-23 at 5-13.

28

1   P.2d 880, 881-82 (Nev. 1983).  Whether to appoint a receiver lies within the court's discretion.

2   *Nishon's, Inc. v. Kendigian*, 538 P.2d 580, 581 (Nev. 1975).

3          The bankruptcy court did not abuse its discretion in appointing a receiver and its factual

4   findings underlying that decision were not clearly erroneous.  There is no dispute that given the

5   parties' litigation positions and personal animosity, decision-making at the OG was deadlocked.

6   Indeed, Telly argued dissolution of OGE and OGEAD was required because "the Members of

7   OGEAD and OGE cannot agree on anything." ECF No. 22-13 at 24.  Further, there was evidence

8   that the OG, a largely cash business, was engaged in practices which could allow the diversion of

9   cash and for which no explanation was given. ECF No. 22-37 at 225 (Telly could not explain why

10  dancers at the OG received a receipt showing they paid $75 to dance at the club regardless of how

11  much they actually paid, which sometimes exceeded $100); *id.* at 296 (dancer testifying she gets a

12  $75 receipt regardless of how much she pays and she pays $105 on the weekends); 22-47 at 7-8

13  (dancer with similar testimony); *see also* ECF No. 1 at 35, 37-38 (bankruptcy court previously

14  found Telly and Afroditi received periodic payments from the club when Dolores did not).  Thus,

15  the bankruptcy court did not abuse its discretion by appointing a receiver to operate the club in

16  the interim until the club could be sold and its affairs wound up.  The receiver's alleged post-

17  appointment failure to run the club as well as the family had is not a basis to conclude the

18  bankruptcy court abused its discretion by appointing a receiver.  I therefore affirm the bankruptcy

19  court's appointment of a receiver.

20          **H.  Bias/Arbitrary and Capricious**

21          The Eliades Family Group argues the bankruptcy court was biased against Peter and

22  Aristotle Holding and made arbitrary and capricious rulings as a result.  Dolores disagrees.

23           There is no basis for the Eliades Family Group's allegations of bias.  "[O]pinions formed

24  by the judge on the basis of facts introduced or events occurring in the course of the current

25  proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion

26  unless they display a deep-seated favoritism or antagonism that would make fair judgment

27  impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994).  The Eliades Family Group does

28

1  not identify any extra-judicial source for the alleged bias.  Nor do the bankruptcy judge's rulings

2  show any deep-seated favoritism or antagonism.  Rather, he found that both sides had engaged in

3  shenanigans and he sanctioned Dolores. ECF No. 1 at 51 (stating that "all the parties, on both

4  sides, have gone to great lengths—some far beyond acceptable bounds—to stretch (or even

5  entirely ignore) the truth in order to harm each other in this case"); *id.* at 90 (sanctioning Dolores

6  for discovery violations).  As discussed throughout this opinion, the factual findings have

7  evidentiary support in the record.

8         Finally, the bankruptcy court's factual findings, credibility determinations, and rulings

9  were not arbitrary or capricious.  The bankruptcy court's comments about the Eliades Family

10  Group's unusual conduct and puzzling litigation positions were fully supported by the record.  As

11  just one example, Telly agreed to a month-to-month lease for the OG, did not pay rent under that

12  lease, and refused to fight the eviction even though this would destroy the club's value to his own

13  detriment and would likely breach his fiduciary duties to the other members of OGE and

14  OGEAD.

15  **IV.  CONCLUSION**

16         IT IS THEREFORE ORDERED that the bankruptcy court's preliminary ruling **(ECF No.**

17  **1 at 7-91) is AFFIRMED**.

18         DATED this 27th day of January, 2017.

19

20                                                    _____
                                                      ANDREW P. GORDON

21                                                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28